**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.:   14-00156-CB** |
| | : | |
| **JEANNE E. SANBORN** | : | |

<u>**UNITED STATES' SENTENCING MEMORANDUM**</u>

COMES NOW the United States of America, by and through the United States Attorney for the Southern District of Alabama, Kenyen R. Brown and Assistant United States Attorney George F. May and hereby files its sentencing memorandum in the above captioned case.

The United States has agreed to recommend a sentence at the low end of the sentencing guidelines range which is a recommended sentence of 30 months (41 months if the Court concludes the defendant should not receive acceptance of responsibility).   Based upon the sentencing factors to be considered by the Court in imposing a sentence, commonly known as the "3553 factors" and in view of the Court's discretion after *Booker v. United States*, 543 U.S. 220 (2005), the United States wishes to bring to the Court's attention information that demonstrates that an imprisonment sentence is clearly called for in this case and urge the Court to impose a custody sentence at the low end of the guidelines.

   1.   **Acceptance of Responsibility.** U.S.S.G. §3E1.1 (a) provides that [i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.   The Application Notes under the Commentary to U.S.S.G. §3E1.1 state:

   In determining whether a defendant qualifies under subsection (a), appropriate
   considerations include, but are not limited to, the following:

(A)     truthfully admitting the conduct comprising the offense(s) of conviction ..

(B)     voluntary termination or withdrawal from criminal conduct or associations;

(C)    voluntary payment of restitution prior to adjudication of guilt;

(D)    voluntary surrender to authorities promptly after commission of the offense;

(E)    voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(F)    voluntary resignation from the office or position held during the commission of the offense;

(G)     post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(H)     the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

The defendant has disentitled herself to Acceptance of Responsibility because she has falsely denied her guilt as to the offense of conviction.   In an e-mail to a government witness dated March 29, 2015, nine days after her guilty plea, the defendant stated: "As you know that I took a plea for many reasons but not because I was guilty." (See Atch 1)   The defendant's disavowal of guilt disentitles her to Acceptance of Responsibility.

**2. Title 18 U.S.C. §3553(a) provides for the following factors to be considered in imposing a sentence.**

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.   The court, in determining the particular sentence to be imposed, shall consider-

(1) the nature and circumstances of the offense and the history and characteristics of the

defendant;

(2) the need for the sentence imposed-

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to
>
> provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training,
>
> medical care, or other correctional treatment in the most effective manner; …

**3.   Nature and Circumstances of the Offense.**   The defendant maliciously set fire to her business located at 3602 Old Shell Road in Mobile in order to collect insurance proceeds.   The defendant caused the insurance company to pay out almost $500,000 due to her criminal actions. There was a person in the building immediately adjoining the building the defendant set fire to who could have been killed or badly injured in the fire.   The fire the defendant set caused 20 Mobile fire personnel people and 7 vehicles to respond.   The defendant maliciously endangered the public for no other reason than pure greed.   During the investigation of the arson the defendant committed bankruptcy fraud, repeatedly lied under oath in a sworn deposition and made false and malicious allegations of misconduct against two of the investigators.

**4.   The history and characteristics of the defendant.**   The defendant is an individual of poor character who has repeatedly lied under oath, and has committed other fraudulent and unscrupulous acts.

**a. Fraudulent Insurance Claim.**   On December 17, 2005, Bridget Hannahan accidently bumped into the 2005 Mercedes Benz sedan of Jeanne Sanborn in the parking lot of The Complete

Skin Care Center (CSCC) located at 3604 Old Shell Road, Mobile, AL 36608.   The location is also the same location of the Endodontic Group owned by Dr. Thomas Hannahan, (Husband of Bridget Hannahan) with the address of 3602 Old Shell Road.   After the accident Bridget Hannahan exchanged telephone numbers with Jeanne Sanborn and informed Sanborn to get an estimate for the damage.   Hannahan stated that she would pay for the damage personally rather than file on her personal insurance company and the defendant agreed.   B. Hannahan states that she never called her insurance company authorizing a claim to be filed and never authorized any insurance payments be made to Jeanne Sanborn.   On December 19, 2005 McConnell Automobile Corporation, Mobile, AL completed a documented repair estimate in the amount of $1,844.05. On December 20, 2005, B. Hannahan issued a personal check to Jeanne Sanborn in the amount of $1,900.00 and thought the matter was resolved.   However, unbeknownst to the Hannahans, on December 19, 2005, Jeanne Sanborn, apparently pretending to be Bridget Hannahan, called Thames Batre insurance company, a broker for The Cincinnati Insurance Company, to report the above accident to authorize the claim and payment to Jeanne Sanborn.   The Cincinnati Insurance Company is the insurance company for vehicle coverage for Thomas and Bridget Hannahan.   B. Hannahan states that she never called to the report the claim and was completely unaware the claim was filed.   On January 5, 2006, Cincinnati Insurance Company issued a check to Jeanne Sanborn for the same estimated vehicle damage provided by McConnell Automotive Corporation in the amount of $1,844.05, and the same damage the defendant had been paid by B. Hannahan.   J. Sanborn then endorsed the check and released the check to McConnell Automotive Corporation as payment for the repair of the damage vehicle.   On or about January 20, 2006, The Cincinnati Insurance Company issued another check to Enterprise Rent a Car in the amount of $422.40 for a

4

rental car expense by Sanborn.   As such, the defendant perpetrated a fraudulent scheme to have her vehicle fully repaired by the insurance company check and also collected an additional $1,900 from Bridgette Hannahan for the same damage.

After later discovering the fraud had occurred, the Hannahans contacted their attorney, Austin Mulherin, and he filed a civil lawsuit against Jeanne Sanborn. (Mobile County District Court Case No. DV-08-900221).   On or about September 12, 2008, Thomas and Bridgette Hannahan entered into a general release/settlement agreement and the defendant, through her business account, paid the Hannahans a total amount of $2,250.00 to reimburse the Hannahans for the fraudulent claim.

**b. Numerous Lies under Oath.**   In a sworn deposition to State Farm Insurance on April 14, 2009 the defendant told numerous lies in an effort to bolster herself in her false claims of the fire being accidental.   One of the lies the defendant made under oath in the deposition was that she "founded" the St. Jude tennis tournament. (pg. 89)   This is a tennis tournament in Mobile dedicated to raising money for St. Jude Children's Research, a pediatric treatment and research facility focused on children's catastrophic diseases.   The founder of the tournament, L.C., is a woman whose daughter K tragically died of bone cancer while in high school.   K was treated at St Jude and her dying wish was to find a cure for cancer.   K was a high school tennis player.   L.C. and her family thus founded the St. Jude tennis tournament.   L.C. categorically informed the undersigned that the defendant had nothing whatsoever to do with the founding of the tournament. The defendant did volunteer for a committee to assist the tournament.   When the defendant discovered that L.C. would be a witness for the government in the case she called L.C. ten times in a period of two hours and left four messages.   When L.C. would not return the defendant's

telephone calls the defendant sent L.C. a text message that said "you will not talk to me, but K knows the truth".   The defendant's unconscionable reference to K in the text message was obviously highly upsetting to L.C.

In the same sworn deposition the defendant falsely claimed under oath that she brought the "Making Strides" breast cancer walk to Mobile. (pg. 89).   The Manager of the American Cancer Society in Mobile, Kathy O'Neil in conjunction with the regional counsel for the American Cancer Society stated "[w]e are not aware of any evidence to support Sanborn's claim that she was responsible for bringing the Making Strides Against Breast Cancer (MSABC) event to Mobile, Alabama."

In the same sworn deposition, in an effort to claim she had no motive to commit the arson, the defendant falsely claimed she was making $10,000 a day in gift certificate sales at the time of the arson. (pg.88-89).   This assertion is flatly rejected by employees at the CSCC.

In the same sworn deposition the defendant was asked about lawsuits filed against her? The defendant falsely only mentioned 2 lawsuits filed against her.   One of the law suits filed against the defendant was filed by a D.P.   The defendant implied in her sworn testimony that D.P. was the one at fault claiming that D.P. "took names and numbers" from the business and thus the defendant withheld her last paycheck.   The defendant neglected to mention that she lost that law suit and was ordered by the judge to pay D.P.[1]

In the same deposition the defendant failed to disclose a lawsuit filed against her by the Eastern Shore Center on March 27, 2009 – only 18 days before the deposition.   When confronted

---

[1] This appears to have been a scheme by the defendant in that she withheld several other employees last paychecks and forced them to hire attorneys to get their last paychecks. The defendant perpetrated the same scheme with other employees to include Hanna Hogle and Katherine Holmes.

with this lawsuit the defendant stated "I forgot that." (pg. 15).   In the same deposition the defendant also failed to disclose a lawsuit filed against her by Regions Bank.

When confronted with the Regions Bank lawsuit the defendant replied "Dirk [her husband] told me there was something with Regions Bank." (pg 21).   The Regions Bank lawsuit was filed on August 19, 2008 -- only 8 months before the deposition?

In the same sworn deposition the defendant also failed to disclose the lawsuit filed against her by Bridgette Hannahan, mentioned above, which was filed by Bridgette Hannahan on February 1, 2008 – only 14 months before the deposition.   In fact the check paid from the defendant's business for $2,250, to pay the Hannahans and settle the lawsuit, was written on July 15, 2008 but not cashed until August 11, 2008 – only 8 months before the deposition.

**c. False Allegation about Law Enforcement Officer in Deposition.**   The defendant made a number of very incriminating statements about the arson to Mobile County Sheriff's Office Deputy Donald Gomien in an interview conducted on December 29, 2008.   Knowing she made the incriminating statements, on January 20, 2009, the defendant called Mobile Fire Department Fire Marshall Douglas Cranford and made a false complaint about Deputy Gomien in an attempt to discredit Gomien.   The defendant falsely told Cranford that Gomien had grabbed her knee during the interview.   The defendant also stated to Cranford that when Gomien grabbed her knee she stated to Gomien, "you just touched me." Three months later in the sworn deposition, mentioned above, the defendant falsely claimed under oath that Gomien grabbed her by the knee and said "just tell me you did it and I 'll make it easier for you." (pg. 88).   Unbeknownst to the defendant, the telephone call to Cranford was recorded and the interview with Gomien was also recorded. Nowhere in the recorded interview with Gomien did the defendant ever say, as she falsely reported

to Cranford, that she said to Gomien, "you just touched me." Nor does the record show that
Gomien stated "just tell me you did it and I'll make it easier for you." In actuality, Gomien
accidentally bumped the defendant's knee during the interview and Deputy Gomien said to the
defendant "sorry to hit the bad knee" and the defendant replied "that's fine." This is what the actual
recording states.   Essentially the defendant took what was an accidental bumping and tried to
deceitfully gain an advantage in her case after she made the incriminating statements to Gomien by
falsely slandering Gomien.

    **d. General deceitful conduct**.   Employees of the CSCC told investigators about
numerous incidents of unscrupulous and/or deceitful conduct by the defendant in her business
dealings with customers, which include the following.   In late December 2008, the defendant
instructed employees Katy Gilstrap and Jessica Zirlott to use a chemical peel solution and a brow
tint on a client that had been damaged due to the arson.   The materials had a strong smoke smell
from the fire which was obvious to both Gilstrap and Zirlott.   The defendant falsely claimed she
could not smell the smoke smell and directed Gilstrap and Zirlott to use the defective products.
Zirlott, at the direction of the defendant, her employer, used the brow tint on the customer which
resulted in a jet black color to the customer's eye brows when the customer desired a brown color.

    Just prior to the arson on December 21, 2008 the defendant directed Jessica Zirlott and
other employees to sell gift certificates for services at the CSCC such as laser hair removal, that the
defendant knew was no longer available at the CSCC.

    Throughout 2008 and in the months preceding and after the arson the defendant bought
generic drug store chain products to be used for expensive facials performed on clients.

    For years prior to and after the arson the defendant owed numerous suppliers for past

8

supplies shipped to her and the suppliers were no longer shipping supplies to the CSCC. Nevertheless, the defendant still allowed customers to order and pay for beauty supplies from her knowing the supply companies would not ship the supplies to her store for the customers due to the defendant's indebtedness.   The employees working at the store were then forced to deal with the customers wanting the products they had ordered and paid for and the beauty supply companies wanting to be paid.   The defendant would not take the phone calls of the customers or the suppliers trying to recover their money.

The defendant had employees, to include Hanna Hogle, use a spray tan applicator that was designed for airbrushing rather than spray tans**.**   When Hogle objected to using the applicator because it was not functioning properly the defendant instructed Hogle to tell clients that their skin would darken after they left the shop even though it had not changed tone from the spray tan.   The defendant then mocked Hogle for being concerned about defrauding the spray tan clients. Throughout 2008 and in the months preceding and after the arson many spray tan customers had spray tans that only lasted one day.   The defendant owed Hogle $1,200 when Hogle stopped working for the defendant in 2011 and the defendant refused to pay her and Hogle was forced to hire an attorney to get her wages from the defendant**.**

The defendant once admonished Hogle for not trying to sell a skin care product to a woman that was designed for Rosacea, a skin condition that caused red and scaly skin.   Hogle informed the defendant that the client had very oily skin and the product was not appropriate for the client. The defendant nevertheless told Hogle that she should have tried to sell the product to the client anyway.   The defendant instructed Hogle and other employees to use products that had visible soot on them from the fire.

The defendant owed a client $500 for a pre-paid service that the defendant was no longer performing.   The client would repeatedly come into the business in Malbis to get her money back from the defendant and the defendant would avoid the client and drive by the business if she saw the client's vehicle.

The defendant also instructed employees to use a machine for laser hair removal that was not designed for that purpose, but rather was designed for acne treatments, treatment of age spots, benign brown pigments and redness caused by broken capillaries.   In approximately 2009 GP paid the defendant $3,000 to $4,000 for laser hair removal in which the inappropriate machine was used.   GP developed an extensive skin rash from the use of the improper machine.   GP demanded her money back from the defendant but the defendant refused to pay.   The defendant used the same skin treatment machine on Anna Corrine Willis for hair removal.

In approximately February 2008, M.S. gave the defendant as estimate of between $1,800 and $2,500 for work in which M.S. was to build and place a wooden pedicure platform in the Complete Skin Care Center with a foot tub.   The defendant agreed to the quote.

After doing the work M.S. invoiced Jeanne and Dirk Sanborn $1,700.00 for the installation.   After M.S. had given the Sanborns the invoice and finished the work, the defendant paid M.S. $200.00 and stated to M.S. that he should " just deal with it".   M.S. states the defendant's husband stated that M.S. did not have any permits for the work he had done and that they were not going to pay any more money to him.   M.S., having just started work in the construction field, was unaware that any permits were required and that having no knowledge of this, he took the $200.00 thinking he had not obtained the proper permit for the work. Investigators checked with Mobile building inspectors and discovered that the work that M.S.

performed for the defendant did not require a permit as there was no alteration to the existing structure or utilities.

**e.  Pattern of bad check writing and deceitful conduct with creditors**.

ATF Forensic Auditor will testify that during a period from May 2007 through December 2008 there was $9,088 in non-sufficient funds (NSF) fees in one of the defendant's bank accounts.   The fee ranged from $31 to $35 per transaction over this time period.   **NSF fees were charged 274 times during this 20 month time period, or 13.7 times per month.**

Analysis of another of the defendant's accounts from February 2007 through July 2008 shows that there was numerous times the account was below zero.   During this time period, there was $2,052 in non-sufficient funds (NSF) fees.   NSF fees were charged 54 times during this 19 month time period.

The defendant had another bank account in which the analysis of from January 2007 through July 2008 shows that there was numerous times the account was below zero.   During this time period, there was $2,014 in non-sufficient funds (NSF) fees.   NSF fees were charged 53 times during this 20 month time period.

The CSCC purchased an Isolaz therapy machine from Aesthera at the end of 2007 or beginning of 2008.   The cost of the machine was $65,430.   The CSCC was to receive a credit of $35,030 against this purchase when they returned a previously bought machine (PPx) to Aesthera.   Aesthera was acquired by Solta Medical in 2010.   Scott Buresh, attorney for Solta, noted in an email that the PPx machine was never returned by The CSCC.   Per the records provided by Scott Buresh, the first Isolaz unit received by The CSCC did not function properly. Therefore, a replacement was shipped out in mid-February 2008.   The Sanborns did not add this

piece of equipment onto their insurance until August of 2008 and did not make many payments on the equipment it until it went into collections in 2010.   As of December 21, 2008, there was a balance due of $26,785.24. on the machine.   Per Attorney Scott Buresh, the correct amount due should have included the $35,030 that was credited to the account since the PPx machine was never returned.   Thus, the correct balance due at the time of the fire was $61,815.24.   It is also significant to note that after the arson the defendant collected $45,000 from State Farm Insurance, specifically for the Isolaz machine.   Despite being specifically reimbursed for the damage to the Isolaz machine, due to the arson and her fraudulent claim, the defendant still failed to pay Solta Medical for the machine.

**f. The defendant pocketed Social Security payments that were required to be paid on behalf of employees to the Social Security Administration**.   In 2007, S.H., former manager of the CSCC, received her Social Security Statement and observed that the report was missing her 2006 and 2007 contributions.   She disputed the missing contributions to the Social Security Administration (SSA) and filed a complaint.   S.H. stated that in 2006, she would receive "post it notes" on her paycheck listing the withholding of Social Security and FICA.   She provided to the SSA her post it notes showing the deductions by the CSCC of her social security tax.   S.H. states she was rewarded the credit by the SSA.

From about 2001 through 2007, R.S. was a nurse at the CSCC.   R.S. found out also through former Manager S.H. that the social security tax taken out of S.H.'s paycheck was not being paid to the SSA.   R.S. stated that she was concerned about her benefits so she approached the defendant about the problem and the defendant told her that it was all taken care of and that it was an oversight by the SSA.   R.S. stated that she contacted the SSA and discovered that the last

2 or 3 years of her employment with the CSCC, her social security tax was not paid by the CSCC. R.S. reported the incident then rechecked about 3 to 6 months later with the SSA and discovered that the amount of tax in question was corrected.

During 2002 to 2006 and 2006 to 2008 E. C., was employed at the CSCC.   Between 2007 and 2008, E.C. was the manager at the spa until she resigned in September of 2008. E.C. stated that their paychecks would not contain a normal paystub listing the deductions.   E.C. found out from her mother, R.S. who formerly worked at the CSCC, that she had discovered that her social security tax taken out of her paycheck was not paid to the SSA.   After E.C. resigned she was informed of the above information from her mother and therefore contacted the SSA.   E.C. discovered that she was missing possibly one year of benefits where it showed that she never worked for the CSCC.   E.C. couldn't recall the year and did not discuss it with the defendant.

During an interview with the ATF on March 6, 2014, the defendant's husband and business partner, Dirk Sanborn, admitted to agents that the CSCC owed the federal government approximately $90,000 in monies the business failed to withhold for employees between 2007 and 2013 for income tax and Social Security withholdings.   Sanborn estimated that the business owed the State of Alabama Revenue Office $20,000 for employees withholding and sales tax.

**g. Bankruptcy Fraud**.   During the pendency of the arson investigation and prosecution, the defendant committed bankruptcy fraud.   Indeed, the defendant was interviewed by the ATF in this case on March 6, 2014.   The defendant was arraigned on the original indictment on July 15, 2014 and she filed her fraudulent bankruptcy petition on July 25, 2014, **while she was under the supervision of this Court. (Doc. 7).**

13

## WITNESSES AT SENTENCING

With the Court's permission the United States would like to present the following witness

at sentencing, who all should be relatively brief:

BRIDGETTE HANNAHAN

ATTORNEY AUSTIN MULHERIN

CATHERINE HANNAHAN

ATF AGENT MARK SLOKE

MOBILE COUNTY SHERIFF'S DEPUTY DONALD GOMIEN

MOBILE FIRE DEPARTMENT CAPTAIN CHARLES CURRERI

ATF FORENSIC AUDITOR JONATHAN ESTWORTHY

LORA CASTELLO

KATY GILSTRAP

JESSICA ZIRLOTT

HANNA HOGLE

WHEREFORE, in consideration of all the above, and particularly the nature and

circumstances of the offenses committed, the United States submits that a custody sentence at

the low end of the guidelines is compelled in this case.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY
by:
*s/ George F. May*
GEORGE F. MAY (MAYG0534)
Assistant United States Attorney
Telephone: (251) 441-5845
Fax: (251) 441-5277

14

## **CERTIFICATE OF SERVICE**

       I hereby certify that on September 18, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Frederick George Helmsing, Esquire: Counsel for defendant, **JEANNE E. SANBORN.**

                                  *s/ George F. May*
                                  GEORGE F. MAY
                                  Assistant United States Attorney